# DEPARTMENT OF INSURANCE v JAAR

## Case No. 88-3461

State of Florida, Division of Administrative Hearings

December 6, 1988

## APPEARANCES OF COUNSEL

**Robert C. Byerts,** for petitioner.

**H. H. Baskin, Jr.,** for respondent.

## OPINION OF THE COURT

J. LAWRENCE JOHNSTON, Hearing Officer.

### *RECOMMENDED ORDER*

A formal administrative hearing was held in this case in Tampa on September 28, 1988. The issue is whether the Petitioner, the Department of Insurance (Department or Petitioner), should discipline the Respondent, Jacob Jack Jaar (Jaar or Respondent) for the following alleged violations of the Insurance Code, Florida Statutes (1987): (1) demonstrated lack of fitness or untrustworthiness, Section 626.611(7); (2) demonstrated lack of reasonably adequate knowledge and technical competence, Section 626.611(8); (3) fraudulent or dishonest practices,

Section 626.611(9); and (4) unfair or deceptive acts or practices, Section 626.621(6) and 626.9541(1)(o).[1]

In the Petitioner's Proposed Recommended Order, the Department proposes that the appropriate discipline for the alleged violations would be a three month suspension, followed by one year of probation, restitution of $1867, and a $500 administrative fine.

The Respondent denies the charges and alleges various defenses, including essentially the following: that the Respondent could not have violated Section 626.9541(1)(o) by "collecting as a premium or charge for insurance" $1867 for time and expenses allegedly incurred by the Respondent in the course of having reinstated an insurance policy by the Respondent in the course of having reinstated an insurance policy that had been cancelled mid-term because, as a matter of law, reinstatement does not create a new insurance policy; (2) that the $1867 was due and owing to the agency with which the Respondent was associated under an implied "side deal" under which the Respondent allegedly was to secure the reinstatement; (3) that the agency with which the Respondent was associated, Consolidated Insurance Associates, Inc. (CIAI), not the Respondent, was solely responsible for any violations arising out of the transactions between the Respondent and the insured; and (4) that, even if the Respondent has some responsibility for violations, CIAI and another licensee associated with the agency, Shirley Cramer, are indispensable parties not named as respondents in this or other administrative proceedings.

At the conclusion of the final hearing, the Petitioner ordered the preparation of a transcript, and the parties' proposed recommended orders were filed on November 7, 1988. Explicit rulings on the parties' proposed findings of fact may be found in the attached Appendix To Recommended Order, Case No. 88-3461.

## FINDINGS OF FACT

1. At all times material to this proceeding, the Respondent was eligible for licensure and/or licensed as a Life and Health Insurance Agent, Fraternal Benefit Insurance Agent, Health Insurance Agent, and General Lines Insurance Agent.

2. At all times material to this proceeding, the Respondent was associated with, and conducted insurance transactions in the name of, Consolidated Insurance Associates, Inc., (CIAI) of Largo, Florida. The

---

[1] Alleged violations of Sections 626.611(10) and 626.561(1), Florida Statutes (1987), contained in the Administrative Complaint were withdrawn at and after the final hearing.

evidence did not establish whether the Respondent was an officer, director, or shareholder of CIAI or otherwise was able to control the business decisions of CIAI.

3. Immediately prior to September of 1983, Thomas Canavan, the business manager for NBCS Partnership, was introduced to the Respondent by one Jerry McCall of State Farm Insurance. NBCS was a partnership of doctors who owned and operated abortion clinics. In the summer of 1983, one of its five clinics was destroyed by arson. Because of the arson and perceived threat of more arson by anti-abortion militants, State Farm gave notice that it would not renew NBCS' property and casualty insurance policy when it expired in September, 1983. McCall introduced Canavan to the Respondent and recommended the Respondent as an insurance agent who could handle the insurance needs of the NBCS Partnership.

4. At the time of the introduction, the Respondent was introduced to Canavan as Jack Jaar of Consolidated Insurance Associates, Inc. At least one other licensee, Shirley Cramer, also was associated with CIAI at the time.

5. In September of 1983, Canavan, on behalf of NBCS, purchased a Home Insurance Company policy (No. BOS-P 247002) through the Respondent.

6. In August of 1984, Canavan applied for and obtained renewal of the insurance policy through the Respondent and, as part of that transaction, provided a check, in payment of the premium ($2,526.00) due, to the Respondent.

7. On or about March 13, 1985, The Home Insurance Company mailed a Notice of Cancellation of the policy to Canavan, effective April 16, 1985.

8. Canavan received the Notice of Cancellation near the end of March and immediately telephoned the Respondent.

9. During the initial telephone conversation between Canavan and the Respondent, Canavan told the Respondent that it was imperative that he have insurance coverage on the NBCS properties, and he requested that the Respondent obtain insurance coverage on the properties.

10. During that initial telephone conversation, the Respondent indicated that he would get busy and attempt to secure insurance coverage for the NBCS properties.

11. During the initial telephone conversation, the Respondent never stated or indicated in any manner that he intended to charge Canavan

or NBCS a fee for his services or expenses or out-of-pocket costs incurred in attempting to secure insurance coverage.

12. At the time of the initial telephone conversation between Canavan and the Respondent, Canavan never expected, based upon his prior experiences with and knowledge of insurance agents, to compensate Respondent or CIAI for obtaining insurance coverage on the NBCS properties, other than by paying a premium for the policy and thereby enabling the Respondent and CIAI to earn a commission from the insurer.

13. At no time during that initial telephone conversation did Thomas Canavan agree to compensate the Respondent or CIAI for services rendered or for expenses or out-of-pocket costs incurred in attempting to obtain insurance coverage for the NBCS properties.

14. After the aforementioned initial telephone conversation, Canavan spoke with the Respondent by telephone eight to ten times. At no time during those telephone calls did Respondent state to Canavan, or indicate in any manner, that he intended to charge Canavan or NBCS a fee for his services or expenses or out-of-pocket costs incurred in attempting to secure insurance coverage. At no time during those telephone calls did Canavan agree to compensate the Respondent or CIAI for services or for expenses or out-of-pocket costs incurred in attempting to obtain insurance coverage for the NBCS properties.

15. At some point during those eight to ten telephone calls, the Respondent indicated he was doing everything he could to secure insurance coverage and that he intended to call the Insurance Commissioner's office for assistance in obtaining insurance coverage on the NBCS properties, specifically by getting the cancelled Home Insurance Company policy reinstated.

16. On April 16, 1985, The Home Insurance Company cancelled the policy of insurance (No. BOS-P 247002).

17. On April 19, 1985, Mr. William Scisiani, Assistant Vice President and General Manager of The Home Insurance Company, in charge of their Orlando office, received a telephone inquiry from the State of Florida, Department of Insurance, concerning the cancellation of the policy in question. Scisciani obtained the policy file, reviewed it, determined that there was no basis for the cancellation, and instructed the underwriter to reinstate the policy.

18. The policy was reinstated on April 26, 1985, with an effective date of April 16, 1985.

19. No inquiries were received at The Home Insurance Company

Orlando office concerning the policy, its cancellation, or reinstatement except for the one inquiry from the Department of Insurance.

20. On the date Canavan received the reinstatement notice, he contacted the Respondent. During that conversation, they discussed securing insurance coverage to take effect after the expiration of the reinstated policy. The Respondent did not state or indicate in any manner that he intended to charge Canavan or NBCS a fee for his services or expenses or out-of-pocket costs incurred in attempting to secure insurance coverage through the expiration date, and Canavan did not agree or indicate that he would compensate the Respondent or CIAI.

21. On or about May 1, 1985, Canavan received a bill for services and expenses in the amount of $1,867 and a letter from the Respondent. In the letter, the Respondent indicated that the bill concerned expenses "incurred in securing new coverages" for NBCS. In the next sentence of the letter, Jaar stated that the cancelled Home Insurance policy had been reinstated. In fact, no "new coverages" had been obtained.

22. Up until the date Canavan received the bill and letter from the Respondent, Canavan was unaware that the Respondent intended to charge him for his services and expenses.

23. At the time Canavan received the bill and letter from the Respondent, he knew that he would need insurance again in four months and was counting on the Respondent to obtain coverage for him. Canavan was extremely concerned about maintaining insurance coverage on the NBCS properties because of the previous losses due to arson.

24. Canavan was relying on the Respondent to obtain insurance coverage for him effective on the date the reinstated policy would expire. Canavan did not know anything about insurance or how it works as far as securing a policy or obtaining reinstatement of a policy. He considered that to be the Respondent's job.

25. As of the expiration of the reinstated policy, the Respondent had not secured any new insurance coverages for the NBCS properties.

26. Other than the bill itself, and accompanying letter, and statements in Jaar's September 15, 1987, letter to Adamo, no evidence was presented that the Respondent incurred the expenses referred to in the bill or devoted the time referred to in the bill.

27. Upon receipt of the bill and the letter from the Respondent, Canavan executed a check payable to CIAI for the total amount of the

202

bill—$1867. For accounting purposes, Canavan noted in the memo portion of the check "insurance charge" because the charge was related to insurance. Canavan delivered the check to the Respondent, and the check was negotiated by CIAI.

28. Even though he was not expecting it, Canavan did not complain about the $1867 charge. He was afraid that complaining would jeopardize his chances of securing new coverages beginning in September, 1985—his primary concern at the time.

29. Later in the summer, Canavan became disgruntled with CIAI for various reasons, including the $1867 charge, and, by August 28, 1985, complained to the Department at its Tampa office. By then, Jaar was no longer at CIAI, but Shirley Cramer still was. Some of Canavan's complaints concerned dealings with Cramer, and he mentioned her and Jaar by name.

## CONCLUSIONS OF LAW

1. Section 626.611, Florida Statutes (1987), provides in the parts pertinent to the charges in the Administrative Complaint, as amended:

The department shall deny, suspend, revoke, or refuse to renew or continue the license of any agent, solicitor, or adjuster or the permit of any service representative, supervising or managing general agent, or claims investigator, and it shall suspend or revoke the eligibility of hold a license or permit of any such person, if it finds that as to the applicant, licensee, or permittee applicable grounds exist:

\* \* \*

(7) Demonstrated lack of fitness or trustworthiness to engage in the business of insurance.

(8) Demonstrated lack of reasonably adequate knowledge and technical competence to engage in the transactions authorized by the license or permit.

(9) Fraudulent or dishonest practices in the conduct of business under the license or permit.

(10) Misappropriation, conversion, or unlawful withholding of moneys belonging to insurers or insureds or beneficiaries or to others and received in conduct of business under the license.

The Administrative Complaint charged the Respondent with violations of all of these statutory provisions but, at final hearing, the Department withdrew the allegations of ultimate fact that supported the charge of a violation of paragraph (10) and abandoned the charge.

2. The Administrative Complaint also charged with Respondent with

**203**

a violation of Section 626.561(1), Florida Statutes (1987), governing the handling of trust monies, but the Department also abandoned that charge at final hearing and in the Petitioner's Proposed Recommended Order.

3. The Administrative Complaint also charges a violation of Section 626.621(6), Florida Statutes (1987), which provides:

The department may, in its discretion, deny, suspend, revoke, or refuse to renew or continue the license of any agent, solicitor, or adjuster or the permit of any service representative, supervising or managing general agent, or claims investigator, and it may suspend or revoke the eligibility to hold a license or permit of any such person, if it finds that as to the applicant, licensee, or permittee any one or more of the following applicable grounds exist under circumstances for which such denial, suspension, revocation, or refusal is not mandatory under § 626.611:

\* \* \*

(6) In the conduct of business under the license or permit, engaging in unfair methods of competition or in unfair or deceptive acts or practices, as prohibited under part X of this chapter, or having otherwise shown himself to be a source of injury or loss to the public or detrimental to the public interest.

The portion of Part X of Chapter 626 that the Administrative Complaint charges was violated by the Respondent under the facts of this case is contained in Section 626.9541(1)(o) 1. and 2., Florida Statutes (1987), which provides:

(1) UNFAIR METHODS OF COMPETITION AND UNFAIR OR DECEPTIVE ACTS.—The following are defined as unfair methods of competition and unfair or deceptive acts or practices:

\* \* \*

(o) Illegal dealings in premiums; excess or reduced charges for insurance.—

1. Knowingly collecting any sum as a premium or charge for insurance, which is not then provided, or is not in due course to be provided, subject to acceptance of the risk by the insurer, by an insurance policy issued by an insurer as permitted by this code.

2. Knowingly collecting as a premium or charge for insurance any sum in excess of or less than the premium or charge applicable to such insurance, in accordance with the applicable classifications

and rates as filed with and approved by the department, and as specified in the policy; or, in cases when classifications, premiums, or rates are not required by this code to be so filed and approved, premiums and charges in excess of or less than those specified in the policy as fixed by the insurer. This provision shall not be deemed to prohibit the charging and collection, by surplus lines agents licensed under part VIII of this chapter, of the amount of applicable state and federal taxes, or fees as authorized by § 626.916(4), in addition to the premium required by the insurer or the charging and collection, by licensed agents, of the exact amount of any discount or other such fee charged by a credit card facility in connection with the use of a credit card, as authorized by subparagraph (q)3., in addition to the premium required by the insurer. This subparagraph shall not be construed to prohibit collection of a premium for a universal life or a variable or indeterminate value insurance policy made in accordance with the terms of the contract.

4. It is concluded that the evidence did not prove a violation of Section 626.611(7), (8) or (9). Jaar's bill to Canavan may have been misleading. It was not clear whether the expenses were incurred in securing reinstatement of The Home Insurance Company policy or in past efforts to secure new coverage, or both. But the evidence did not go so far as to prove that Jaar was being dishonest or was trying to defraud Canavan. Nor did the evidence prove lack of fitness or trustworthiness or reasonably adequate knowledge and technical competence.

5. On the other hand, the evidence did prove "unfair or deceptive acts or practices" proscribed by Section 626.621(6), Florida Statutes (1987). Section 627.403, Florida Statutes (1987), defines "premium" as follows:

"Premium" is the consideration for insurance, by whatever named called. Any "assessment," or any "membership," "policy," "survey," "inspection," "service" or similar fee or charge in consideration for an insurance contract is deemed part of the premium.

Expenses incurred in securing new coverages constitute a fee or charge in consideration for insurance and fall within the definition of "premium."

In *Drew v Insurance Commissioner and Treasurer,* 330 So.2d 794, 796 (Fla. 1st DCA 1976), the First District Court of Appeal recognized that an agent who charged a similar service fee violated Section 626.970(2), Florida Statutes (1973), the predecessor to Section

626.9541(1)(o)2. Agent Drew had charged his customers for his services and expenses, including long distance telephone call, time and clerical help in servicing policies and time spent selling policies for which he was unable to collect commission when the policies were subsequently cancelled. *Id.* at 795. Although he called it a "contingency fee," the components of the fee are almost identical to the components of the bill which the Respondent presented to Canavan. The First District Court of Appeal determined that "the evidence in this case is unquestionably sufficient to support the examiner's finding that Mr. Drew was guilty of violation of Chapter 626, Florida Statutes, by charging and collecting a contingency fee . . ." *Id.* at 796.

6. The fact that no new coverage was obtained does not remove this case from the proscription of Section 626.9541(1)(o)1. To the contrary, it is concluded that assessment of a fee or charge for unsuccessful efforts to secure insurance is one of the circumstances intended to be addressed by that statute.

7. Because of the conclusion of law that Section 626.9541(1)(o)1. prohibits the $1867 charge the Respondent and CIAI collected from Canavan in this case, Jaar's defense that Canavan impliedly agreed to the charge has no merit as a matter of law. The alleged agreement would be voidable as against the public policy reflected in the regulatory statute. Cf. *Title & Trust Co. of Fla. v Parker,* 468 So.2d 520 (Fla. 1st DCA 1985); *Thomas v Ratiner,* 462 So.2d 1157 (Fla. 3d DCA 1984), *pet. for rev. den.,* 472 So.2d 1182 (Fla. 1985).

8. In addition, the evidence did not prove the factual allegations of the defense referred to in the preceding paragraph. Canavan had no idea that the NBCS partnership would be charged for Jaar's alleged services and expenses until he was presented with the bill. He paid the bill immediately, but his action signified more his desperation to secure coverage in September, 1985, than his agreement to pay CIAI $1867 in addition to the premium coverage.

9. It is concluded that the Respondent is responsible for the violation of Section 629.9541(1)(o)1. even though the bill was from, and was paid to, CIAI.

10. It is concluded that no statutory provision prohibits the Department from proceeding only against Jaar. ("The Administrative Procedure Act cannot relegate matters of constitutional proportions to administrative agency resolution, nor can it impair judicial jurisdiction to determine constitutional disputes." *Department of Transportation v Morehouse,* 350 So.2d 529, 533 (Fla. 3d DCA 1977) (citations omitted); *Key Haven Associated Enterprises, Inc. v Board of Trustees of*

*the Internal Improvement Trust Fund,* 427 So.2d 153 (Fla. 1983); *Smith v Willis,* 415 So.2d 1331 (Fla. 1st DCA 1982).)

11. Section 626.681(1), Florida Statutes (1987), provides:

(1) Except as to insurance agencies, if the department finds that one or more grounds exist for the suspension, revocation, or refusal to renew or continue any license or permit issued under this chapter, the department may, in its discretion, in lieu of such suspension, revocation, or refusal, and except on a second offense or when such suspension, revocation, or refusal is mandatory, impose upon the licensee or permittee an administrative penalty in the amount of $500 or, if the department has found willful misconduct or willful violation on the part of the licensee or permittee, $2,500. The administrative penalty may, in the discretion of the department, be augmented by an amount equal to any commissions received by or accruing to the credit of the licensee or permittee in connection with any transaction as to which the grounds for suspension, revocation, or refusal related.

Section 626.691(1), Florida Statutes (1987), provides:

(1) If the department finds that one or more grounds exist for the suspension, revocation, or refusal to renew or continue any license or permit issued under this part, the department may, in its discretion, except when an administrative fine is not permissible under § 626.681 or when such suspension, revocation, or refusal is mandatory, in lieu of such suspension, revocation, or refusal, or in connection with any administrative monetary penalty imposed under § 626.681, place the offending licensee or permittee on probation for a period, not to exceed 2 years, as specified by the department in its order.

Under these statutory provisions, administrative fines and probation are permitted, under circumstances present in this case, in lieu of, but not in addition to, suspension or revocation. There is no statutory provision for restitution except perhaps as a condition of probation. Restitution by Jaar would not be appropriate since the $1867 was charged and received by CIAI, not Jaar. There was no evidence as to Jaar's "commission" on the charge.

## RECOMMENDATION

Based on the foregoing Findings of Fact and Conclusions of Law, it is recommended that the Insurance Commissioner enter a final order finding the Respondent, Jacob Jack Jaar, guilty of violation Sections 626.9541(1)(o)1. and 626.621(6), Florida Statutes (1987), and fining him $500.

RECOMMENDED this 6th day of December, 1988.